[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 792
This is an appeal from an assessment of damages by the defendant for the taking of a sanitary sewer line easement and certain other rights, which easement and rights are under, over and across property of the plaintiffs, as shown on a map entitled: "MAP NO. SS114 TOWN OF SUFFIELD SANITARY SEWER PROJECT CONTRACT NO. 9 EASTERLY OF EAST STREET SUFFIELD, CONNECTICUT SCALE 1" = 40' DATE 5-30-1990 SHEET 1 KWP ASSOCIATES." A certified copy of said map, revised to December 19, 1990, was introduced into evidence as Exhibit B by agreement between the parties. The taking was also described in a document entitled: "Schedule A Sanitary Sewer Line Easement" introduced into evidence and marked Exhibit A.
The parties stipulated that the date of taking was October 9, 1991, and that damages as assessed by the defendant in the amount of $4,200 were deposited by the defendant and have been withdrawn by the plaintiffs.
The Town of Suffield lies in the northern portion of Hartford County. It is bounded on the north by the State of Massachusetts and on the east by the Connecticut River. It is a rural-residential community which is approximately 17 miles north of Hartford and about 10 miles south of Springfield. Bradley International Airport lies to the south and is partially within the Town of Suffield.
The subject property is in the southeast quadrant of the town and is bounded on the east by the Connecticut River and the Windsor Locks Canal and on the west in part by East Street (Route 159). There are some single family houses along East Street but the interior land is essentially undeveloped except for Eagles Watch, a residential development on East Street to the north of the subject property. The Suffield Plan of Development suggests middle income housing for land use in the area of the subject site, but there are several approved CT Page 793 subdivisions with roads and utilities in Suffield which lie idle awaiting an increase in demand. The subject property is in the R-25 one family residence zone which permits single family dwellings on a minimum site of 25,000 square feet. It is an irregularly shaped piece which, before the take, consisted of 34.5 acres, more or less. It has 272 feet, more or less, of split frontage on East Street and on it there are found a two-story frame two-family dwelling, one barn and three sheds. The property is at street grade and is reasonably level except for the easterly portion where it slopes down to the Connecticut River. It also slopes down to a shallow brook which is about at the northerly boundary of the property. There is a substantial area which is within inland wetlands. There is a large area of farmland used for agriculture and the remaining part of the subject property is wooded. Before the take there was a sewer easement 25 feet in width with a sanitary sewer line approximately 980 feet long running approximately north and south across the subject property. Utilities available include water, sewer, electricity and telephone service. The subject property is within the Upper Connecticut River Conservation Zone and thus cannot be developed until after the Connecticut River Assembly has had an opportunity to review and comment upon any application for development.
The Town of Suffield has entered into a number of contracts to extend gravity sewer lines and to build or rehabilitate pumping stations. The subject take was for the construction of a gravity flow sewer line under one of the contracts. Because it was a gravity flow line, it eliminated a pumping station. The defendant acquired a permanent easement consisting of 0.77 of an acre, more or less, and a temporary construction easement of 0.78 of an acre, more or less, running approximately through the middle of the subject property in a northerly and southerly direction. The permanent easement provides a right to lay, maintain, operate, construct, use, alter, repair and replace a sanitary sewer line and appurtenances in, through, on, over and under a parcel of land a portion of which is 20 feet in width and a portion of which is 30 feet in width. The temporary construction easement is 20 feet in width westerly of the permanent easement for about 1,390 feet and 15 feet in width both CT Page 794 easterly and westerly of the permanent easement for about 195 feet. The plaintiffs may not put any permanent obstruction over the easement which would require removal or replacement in order to obtain access to the sewer line or which would interfere with the operation or maintenance of the sewer line. They have the right to construct and repair a roadway, sidewalks and utility services across the sewer line to serve future development and to use the easement for all purposes not inconsistent with its use for a sewer line. The sewer line is buried underground for most of its length. There are six manhole covers within the easement area providing access to the sewer line. Near the northern end, the sewer pipe is above ground and is carried over the brook suspended from a footbridge spanning the brook. Public access to the bridge is denied, but it is visible from the northern portion of the property.
After the take, there will be an additional sewer line easement crossing over the subject property. The property owner may use the easement area for purposes not inconsistent with its use for a sewer line but may not construct buildings in the easement area. The easement does not adversely affect either the use of the subject property for agricultural purposes or the use of the dwelling on the property.
The plaintiffs called Peter R. Marsele, a qualified real estate appraiser, as an expert witness. Marsele concluded that the highest and best use for the subject property is for residential development at some time in the future. It was his opinion that the location of the easement will severely hinder development, particularly because the land is now encumbered by two easements which split the property into several parts. He used the market comparison approach to value and used four sales of acreage to arrive at a market value of $15,000 per acre making a total of $518,000 for the subject property before the take. He opined that after the take, the value of the subject property was $311,000. He reduced the value of the subject property by 40% because of the easements to $9,000 per acre. He thus estimated damages at $207,000 which included damages of $8,600 for the easements only. It was his opinion that the value of the remaining acreage was reduced by the CT Page 795 presence of the sewer line easement and the footbridge because some lots in a potential subdivision would be lost as a result, although he had no opinion as to the number of lots which might be lost.
The defendant called Robert John Trombley of the Suffield water Pollution Control Authority to explain the sewage collection and treatment program being undertaken in Suffield which led to the condemnation of the subject property.
Jerry R. Adkins, a qualified real estate appraiser was called as an expert witness by the defendant. Adkins concluded that the highest and best use for the subject property was for continued use as two family residential site for the East Street frontage with rear farm acreage. He used the sales comparison approach to value and used five sales which he concluded were comparable. Three of these properties were purchased for agricultural purposes, one for a golf club and one for future residential development. He concluded that the market value of the subject property before the take at $12,000 per acre was $414,000. Adkins opined that the easement resulted in no damage outside the easement area and that a potential development could be planned around it. It was his opinion that the area of the permanent easement was reduced in value by 30% and thus estimated damages due to the permanent easement at $2,772. He estimated damages from the temporary construction easement by using a capitalization rate of 10% of the estimated value of 0.78 of an acre at $12,000 per acre over 1 1/2 years for construction, arriving at a figure of $1,404. He estimated total damages at $4,200.
The defendant also called Arnold J. Grant III, a qualified real estate appraiser, as an expert witness. Grant opined that the highest and best use for the subject property was to hold it in anticipation of future residential development. He found that there was no likelihood of development in 1991 because there were many lots available at that time. He opined that the existence of the sewer easement will not interfere with residential use of the subject property. Although the easement area may not have a building placed upon it, a road may be placed across it and a developer would be CT Page 796 able to plan so that residential potential development will not be diminished. He opined that the footbridge is in an area which is unbuildable and would not result in diminished value of the surrounding land. He used the direct sales comparison approach and analyzed 26 sales. Assigning greater weight to those he found more comparable, Grant concluded that the subject property had a value before the take of $7,500 per acre for the unencumbered land and $3,750 per acre for the 0.56 of an acre encumbered by the old sewer easement. He opined that the total market value of the subject property before the take was $256,650. He opined that the value of the 0.77 of an acre easement area was $3,750 per acre after the take and that the market value of the subject property after the take was reduced to $253,763. He thus estimated damages due to the taking of the permanent easement at $2,887. He estimated damages for the temporary construction easement by multiplying the land value of 0.78 of an acre at $7,500 an acre by a 10% rate of return for one year, arriving at a figure of $585. He thus estimated total damages at $3,500.
The plaintiffs offered no evidence that they had any plans for development of the subject property, and at the date of taking there was little if any demand for residential development in Suffield. Nevertheless, the subject property is zoned for residential use and is in a desirable location. I have concluded that residential development of the subject property at the appropriate time in the future is the highest and best use to which it can be put. In some respects, the presence of a sewer line might be beneficial because it could eliminate the need for septic systems. Here there was already a sewer easement on the subject property. The new easement would affect placement of structures in any plan for residential development in future because no building or planting which interfered with use of the easement for the sewer line could be placed within the easement area. Although the condemnees are given the right to construct a roadway and sidewalks across the easement area, these structures would be subject to disturbance if necessary to work on the sewer line. This is a factor which prudent and knowledgeable buyers and sellers would consider in determining fair market value of the property. CT Page 797
The duty of a referee in an appeal from an award for the acquisition of property by eminent domain is to reach his own conclusion of value by weighing the opinions of the appraisers and the claims of the parties in the light of all the circumstances bearing on value and of his own knowledge of the elements affecting value.
After having seen the property, and having given due consideration to the testimony of all the witnesses and to all of the evidence, and relying upon my own knowledge of the elements establishing value, I have concluded that the damages sustained by the plaintiffs were $31,899. Judgment may enter for the plaintiffs for the further sum of $27,699 in addition to the sum of $4,200 which was deposited by the defendant, with interest on said further sum from the date of taking to the date of payment, together with costs and an allowance of $1,000 towards their appraisal fee.
George D. Stoughton State Trial Referee